RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 07a0089p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

　　　　　　　*Plaintiff-Appellant,*

　　　　v.

FADYA HUSEIN,

　　　　　　　*Defendant-Appellee.*

No. 05-2548

>

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 04-80750—Victoria A. Roberts, District Judge.

Argued: February 2, 2007

Decided and Filed: March 2, 2007

Before: MARTIN, COLE, and GILMAN, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Patricia G. Gaedeke, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellant. Carole M. Stanyar, Detroit, Michigan, for Appellee. **ON BRIEF:** Jennifer Peregord Sinclair, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellant. Carole M. Stanyar, Detroit, Michigan, for Appellee.

_____

## OPINION

_____

RONALD LEE GILMAN, Circuit Judge. Fadya Husein pled guilty to federal charges relating to her role in the distribution of 763 pills of ecstasy, a controlled substance. A probation officer calculated her advisory Guidelines range to be between 37 and 46 months in prison. Prior to sentencing, Husein moved the district court to grant a downward departure based on extraordinary family circumstances. Husein alleged that her father was totally incapacitated due to the effects of several strokes that he had recently suffered, and that the round-the-clock care that she provided both to him and to her three younger minor siblings was "irreplaceable." A court-ordered home visit by Husein's probation officer subsequently confirmed these allegations.

Acting pursuant to United States Sentencing Guidelines (U.S.S.G.) §§ 5H1.6 and 5K2.0, as well as 18 U.S.C. § 3553(a), the district court concluded that Husein's family circumstances were in fact extraordinary, and therefore granted her motion for a downward departure. The result was

1

a noncustodial sentence of 3 years' supervised release, which included an initial term of 270 days of home confinement. As a formality, the district court also imposed a one-day term of custodial imprisonment, but Husein was given credit for already having served that time.

The government argues on appeal that certain post-sentencing discoveries and developments undermine the basis for Husein's sentence and, in the alternative, that even based on the facts in the record alone, the departure granted by the district court was an abuse of discretion and/or unreasonable in light of *Booker*. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

### A.      Factual background

In August and September of 2004, Fadya Husein participated in two transactions involving the sale of ecstasy near her home in Dearborn, Michigan. She was physically present for both transactions, which took place in or around the cars of the other individuals who were indicted along with her. Husein was neither a buyer nor a seller in either transaction, and she was not the source of the ecstasy pills exchanged. But she did help to arrange the meetings by putting Mohammed Nasser, "the number one Defendant in this case" according to the government, in contact with the other indicted individuals. In her guilty plea, Husein admitted these basic facts.

Husein is 25 years of age and the oldest of five children. She has three brothers and one sister, who were 21, 15, 11, and 17 years of age, respectively, at the time of sentencing. All of the siblings live together in Dearborn, Michigan, with the exception of Husein's eldest brother Fady, who resides in Florida. Husein married Tarek Hussein in 2001, but they separated in 2003 and have had no contact since. She stayed in school through the eleventh grade and is currently pursuing a GED. Husein works as a packager at a factory in Sterling Heights, Michigan. Until her father's death in February of 2006, she and her 46-year-old mother had alternated shifts at the factory to ensure that at all times an adult would be at home to attend to her father.

This appeal principally concerns the healthcare needs of Husein's father, as well as the overall financial condition of the Husein household, at the time of sentencing. The district court provided a thorough summary of the relevant facts during the October 2005 sentencing hearing:

> The Defendant's father suffered a stroke seven years ago, after which various organs began to fail. He was placed on dialysis to treat chronic kidney failure. Mr. Husein also suffers from coronary artery disease, diabetes, hypertension and cardiomyopathy. Several weeks ago he suffered another stroke. He was taken to the hospital on September 14th due to complications from renal failure, dementia and fluid on the brain. These conditions, according to Mr. Weidemeyer's [Husein's probation officer] visit to the family on September 15th, 2005 have left Mr. Husein paralyzed on his right side, unable to use the restroom without assistance, unable to walk, barely able to talk. He is to be fed via a feeding tube attached to his stomach. During the home visit, Mr. Weidemeyer observed Mr. Husein's bedroom which contained a hospital bed, a breathing machine and a feeding machine.

> The Defendant resides at home with her parents and three minor siblings. Per Defendant's counsel and per the observation of Mr. Weidemeyer, Mr. Husein is completely incapacitated and relies on the care of others.

> Mr. Husein does not receive financial assistance from Social Security. Therefore, Defendant says that she and her mother provide for all of the family's financial and

other needs. Defendant and her mother alternate working shifts at a factory to insure that an adult is always home to attend to Mr. Husein and the minor children.

Additionally, Defendant Husein is the only member of the household with a valid driver's license and says that she is responsible for transporting her siblings as necessary and performing all other functions that require an automobile. Defendant also says that she helps the youngest child with homework and assists in cooking, cleaning and shopping. There is an older brother who has lived outside of the state of Michigan and per investigation does not assist the family financially or otherwise.

. . .

The Court wants to place more in the record of Mr. Husein—Mr. Weidemeyer's findings from his September 15th home visit, where it appears that Miss Husein's day begins as early as six a.m. and ends at 11 p.m. each day. At six [a.m.], she and her mother work or depart for work at [Volt] Services in Sterling Heights. At 10 a.m., Miss Husein drives home everyday to administer her father's medicine and feed him through his feeding tube. I believe she returns to work at 2:30 [p.m.], picks up her younger siblings from middle school, drives them home and returns to work again. At 4:30 [p.m.], the Defendant drives her mother home from work and then returns to work until 11 p.m. She reports that she works approximately 65 hours per week and that she's responsible for 50% of the family income; that all of her income is used to pay the home mortgage and the mortgage is in her name. The 50%—she provides 50% of the family income and [t]he income is used to pay the mortgage, utilities, food and supplies for her siblings.

## B.     Procedural background

A federal grand jury charged Husein in a three-count indictment that also named Nasser, Mamoon Sufyan, Emanuel Bobic, and Ibrahim Abdel. Count One charged Husein with conspiracy to possess and distribute ecstasy, a controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 846. Counts Two and Three charged Husein and the other named defendants with unlawfully aiding and abetting one another in the distribution of ecstasy, in violation of 21 U.S.C. §§ 841(a)(1) and 18 U.S.C. § 2. Husein pled guilty to all three counts. Prior to sentencing, she filed a motion requesting that the district court grant a downward departure in light of Husein's extraordinary family circumstances, specifically the condition of her dying father. The government opposed the motion, arguing, among other things, that Husein and the care that she provided to her father were not "irreplaceable."

A probation officer prepared a Presentence Report (PSR) in which he calculated Husein's advisory Guidelines range to be between 37 and 46 months in prison. This was based on a total offense level of 21, which reflected a 3-level reduction for acceptance of responsibility. Husein was not assessed any criminal-history points. In September of 2005, after having reviewed Husein's motion for a downward departure, the district court requested that the probation officer visit Husein's home for a second time and report on her family's circumstances, especially her father's health. The probation officer reported his findings in a letter that he presented to both parties at the beginning of Husein's sentencing hearing on October 5, 2005. Part I.A. above accurately reflects the relevant portions of the probation officer's findings.

During the hearing, the district court made several rulings both for and against Husein. The court overruled Husein's objection to the PSR's drug-amount calculation and rejected Husein's argument that she was entitled to an additional multi-level adjustment for playing only a minor role in the offenses. But the bulk of the hearing was devoted to Husein's motion for a downward

departure based on family circumstances. After meticulously reviewing Husein's family circumstances in light of relevant caselaw, the district court concluded that Husein "has presented sufficient facts to warrant a departure under [U.S.S.G. §] 5H1.6, and the Court will grant the [defendant's] motion." The court based this conclusion in large part on its earlier finding that Husein was irreplaceable to her family:

> Assuming that the Defendant's representations here are true, the Court finds that she has established that she is personally responsible to a significant extent for the physical and financial support of her father. She also provides significant financial and other support to her mother and minor siblings. *It appears that there is no one else available to fill Defendant's role if she were incarcerated.*

(Emphasis added.)

The district court then imposed a noncustodial sentence of 3 years' supervised release, which included an initial 270-day term of home confinement. During the period of home confinement, Husein was required to wear an electronic monitoring device as directed by her probation officer. The district court also imposed a one-day term of custodial imprisonment, but Husein was given credit for already having served that time. At the conclusion of the sentencing hearing, the district court offered Husein the following words of advice:

> Miss Husein, the sentence is imposed in large part because the Court has reviewed the Presentence Investigation Report and believes that you—your family is going to benefit more by your presence than society is going to benefit from your incarceration. But the sentence in no way is meant to minimize what you did and your participation in this crime, and we hope that this is an adequate enough deterrent to you so that you don't engage in criminal activity in the future.

> You have a family that obviously depends on you a great deal and if you do anything that is violative of the conditions that are set on you, you could find yourself back here or in front of some other Court and another Judge may not give you this break that you are asking for and that we granted today.

The government timely appealed the district court's ruling in regard to Husein's sentence.

## II. ANALYSIS

We read the government's briefs as presenting two distinct arguments: (1) that certain facts discovered by the government after sentencing would have necessarily altered the district court's conclusion that Husein's family circumstances were extraordinary, and (2) that, even ignoring these new facts, the lengthy downward departure granted by the court on account of extraordinary family circumstances was still an abuse of discretion and/or unreasonable in light of 18 U.S.C. § 3553(a). These arguments will be addressed in reverse order. We do this because if we were to conclude that the district court erred in granting the family-circumstances departure based on the facts known to the court at the time of sentencing, then we would obviously have no need to reach the alternative question of whether the district court erred based on what the government discovered only after sentencing.

### A.        Standard of review

The Prosecutorial Remedies and Tools Against the Exploitation of Children Today Act of 2003 ("PROTECT Act"), Pub. L. No. 108-21, 117 Stat. 650, changed the standard for reviewing a district court's application of the Guidelines, including available departures, to the facts of a given case. *United States v. Holz*, 118 F. App'x 928, 931 (6th Cir. 2004). Prior to the PROTECT Act, this

and other courts applied the abuse-of-discretion standard of review to a district court's decision to depart downward at sentencing. *United States v. Reed*, 264 F.3d 640, 646 (6th Cir. 2001) (citing *Koon v. United States*, 518 U.S. 81, 100 (1996)). The PROTECT Act mandated a change to the less deferential de novo standard, *see Holz*, 118 F. App'x at 931, which this court has since applied. *See, e.g.*, *id.*; *United States v. Marine*, 94 F. App'x 307, 309 (6th Cir. 2004).

But after the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), which changed the status of the Guidelines from mandatory to advisory, the continuing validity of the de novo standard has been called into question. The few courts to have considered this issue have all ruled that, post-*Booker*, the abuse-of-discretion standard is once again the proper standard for reviewing a district court's decision to depart downward under the Guidelines. *See, e.g.*, *United States v. Menyweather*, 431 F.3d 692, 697 (9th Cir. 2005), *amended on other grounds*, 447 F.3d 625 (9th Cir. 2006) ("[W]e hold that the appropriate standard for reviewing the district court's determination of its departure authority is abuse of discretion, the standard in place before the statutory de novo review was enacted [pursuant to the PROTECT Act] in 2003." (citing *Koon*, 518 U.S. at 98-100)) (citation omitted); *United States v. Selioutsky*, 409 F.3d 114, 119 (2d Cir. 2005) ("Since the sentencing judge has discretion with respect to departures, *see* U.S.S.G. § 5K2.0 (court 'may depart'), we consider whether the District Court abused (or exceeded) its discretion in using a family circumstances departure to select the Defendant's Guidelines sentence.").

The rationale offered by these courts, and the one that we now adopt, is that the Supreme Court in *Booker* explicitly severed the statutory provision mandating the de novo review of departures, 18 U.S.C. § 3742(e), from the Sentencing Reform Act of 1984 in order to uphold the Act's constitutionality. *Booker*, 543 U.S. at 259; *see also Menyweather*, 431 F.3d at 697 (reinstituting the abuse-of-discretion standard "[b]ecause *Booker* excised the de novo review of departures previously mandated by 18 U.S.C. § 3742(e)"). Of course, we must still review the overall sentence for reasonableness. *See United States v. Webb*, 403 F.3d 373, 383 (6th Cir. 2005); *cf. Selioutsky*, 409 F.3d at 119 (treating the question of whether a departure is permissible under the Guidelines as simply one element of the general reasonableness review mandated by *Booker*).

## B.     Husein's family circumstances

### *1.      The district court did not abuse its discretion*

The government correctly notes that even though the Guidelines are no longer mandatory, sentencing courts still must consider "any pertinent policy statement" contained therein. *See* 18 U.S.C. § 3553(a)(5). And, to be sure, § 5H1.6 is one such statement. It provides in pertinent part that "family ties and responsibilities are not ordinarily relevant in determining whether a departure may be warranted." U.S.S.G. § 5H1.6. This, in turn, makes family circumstances a "discouraged" factor under the Guidelines. *See Koon*, 518 U.S. at 95 ("Discouraged factors . . . are those not ordinarily relevant to the determination of whether a sentence should be outside the applicable guideline range.") (quotation marks omitted).

But this policy statement alone does not render the district court's decision to grant Husein a downward departure based on family circumstances an abuse of discretion. *Booker* in part accounts for why. As the First Circuit recently explained:

> Under the Guidelines, courts are discouraged from taking family circumstances into account, *see* U.S.S.G. § 5H1.6, and before *Booker* the court would have been unlikely to take them into account in imposing sentence. After *Booker*, however, the fact that a factor is discouraged or forbidden under the guidelines does not automatically make it irrelevant when a court is weighing statutory factors apart from the guidelines.

*United States v. Aitoro*, 446 F.3d 246, 255 n.9 (1st Cir. 2006); *see also United States v. Davis*, 458 F.3d 491, 498 (6th Cir. 2006) (noting that "[i]n an appropriate case, a trial court . . . has a freer hand to account for" a factor disapproved of by the Sentencing Commission's policy statements.)

Nevertheless, when a district court departs downward on the basis of a discouraged factor such as family circumstances, those circumstances must be "exceptional." *Koon*, 518 U.S. at 96 (noting that a district court should consider a downward departure based on a discouraged factor "only if the factor is present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present"), *quoted in Reed*, 264 F.3d at 653-54; U.S.S.G. § 5K2.0(a)(4) ("An offender characteristic or other circumstance identified in . . . the guidelines as not ordinarily relevant in determining whether a departure is warranted may be relevant to this determination only if such offender characteristic or other circumstance is present to an exceptional degree.").

This court has not yet articulated a set of factors to consider in determining what constitutes "exceptional" or "extraordinary" family circumstances. It has instead resorted to a less structured comparative approach that takes the facts of a given case and compares them to the facts and holdings of other cases also involving departures for family circumstances. *See, e.g.*, *Holz*, 118 F. App'x 928; *Reed*, 264 F.3d 640. Fortunately, the recent commentary added to § 5H1.6 offers substantial guidance by requiring the presence of the following four "circumstances" before a determination of extraordinariness may be made:

(i)    The defendant's service of a sentence within the applicable guideline range will cause a substantial, direct, and specific loss of essential caretaking, or essential financial support, to the defendant's family.

(ii)   The loss of caretaking or financial support substantially exceeds the harm ordinarily incident to incarceration for a similarly situated defendant. For example, the fact that the defendant's family might incur some degree of financial hardship or suffer to some extent from the absence of a parent through incarceration is not in itself sufficient as a basis for departure because such hardship or suffering is of a sort ordinarily incident to incarceration.

(iii)  *The loss of caretaking or financial support is one for which no effective remedial or ameliorative programs reasonably are available, making the defendant's caretaking or financial support irreplaceable to the defendant's family.*

(iv)   The departure effectively will address the loss of caretaking or financial support.

U.S.S.G. § 5H1.6, cmt. 1(B) (emphasis added).

The only factor that the government challenged in the district court was the third factor: Husein's irreplaceability. Because this challenge also forms the core of the government's argument on appeal, our analysis omits discussion of any of the other factors listed above.

The government argues that because "there were untapped resources available to the family," Husein was not irreplaceable. Specifically, the government refers to Husein's oldest sister Shadya, Husein's mother Fizan, Husein's oldest brother Fady, and unnamed "friends, other extended family members, or neighbors [who] *might have been* able to render assistance in Mr. Husein's care." (Emphasis added.) But the mere existence of potential alternative sources of assistance or care is not sufficient to undermine a claim of irreplaceability. Instead, as the wording of the Guidelines

makes clear, the alternatives must also be "reasonably available," which has been understood to mean "feasible" and "relatively comparable" to the defendant. *See Menyweather*, 431 F.3d at 699 (emphasis omitted); *United States v. Roselli*, 366 F.3d 58, 68-69 (1st Cir. 2004).

None of the alternatives suggested by the government meets this standard. Although the government is correct in noting that Shadya Husein "was only three months shy of her eighteenth birthday at the time of sentencing," she was also a full-time high-school student at the time. Fizan Husein was an even less feasible option. She alternated shifts with Fadya at the factory in Sterling Heights in order to ensure that one adult would be home at all times to attend to Husein's father. If the district court had sent Fadya to jail, her mother Fizan would have been forced to quit her job and stay home. But Fizan was the family's only source of income aside from Fadya, because Fadya's father was not receiving any Social Security benefits. Jailing Fadya, in other words, not only would have forced her mother to remain at home, but would have put the entire family on welfare. This fact alone strongly suggests infeasibility. *See United States v. Norton*, 218 F. Supp. 2d 1014, 1019 (E.D. Wis. 2002) (noting that one of the principal considerations to "have emerged from the cases reviewing § 5H1.6 departures" is "whether the defendant's absence would force the family onto public assistance"); *United States v. Owens*, 145 F.3d 923, 926 (7th Cir. 1998) (affirming a downward departure where the defendant supported his family financially and the family would therefore be forced into public housing and/or welfare if he were incarcerated).

Finally, Fady Husein lived in Florida, did not have a job, and was unwilling to "step up to the plate" to help his family in Michigan. Fizan herself said that her son "does not help the family in any way. He visits us on occasion, but he doesn't have a job. *He will not come back to live here no matter what happens to Fadya*." (Emphasis added.) In any event, the district court's conclusion that Fady was not a feasible alternative "financially or otherwise" was based not only on the evidence offered by Husein, but also on the court's own investigation.

The one obvious nonfamilial alternative that neither party mentions—and that the district court failed to consider at sentencing—was for Husein's father to have gone to a hospital for professional care. This omission is especially glaring because Husein's father had already received treatment for the same symptoms on several occasions at a nearby hospital. A return to that hospital, accordingly, would seem to have presented precisely the type of alternative that the district court should have considered in determining whether Husein was truly "irreplaceable."

Husein's case, however, survives this omission in the district court's analysis for the same reason that Husein's mother did not present a feasible alternative. Simply stated, the Huseins would not have been able to afford the hospital bills. We recognize that the options of Medicaid and/or hospice treatment might have been available, but the government never suggested them as alternatives. Nor has the government raised the possibility on appeal. As defense counsel noted at oral argument, moreover, Fizan Husein possessed limited "life skills" and likely would not have thought of or even known how to pursue such options in Fadya's absence.

Furthermore, the case on which the government most heavily relies, *United States v. Pereira*, 272 F.3d 76 (1st Cir. 2001), is easily distinguishable from the present case. The government's own summary of *Pereira* reveals that the court specifically noted that "[n]othing in the record supports the district court's conclusion that the family could not afford such external care" for Pereira's parents. *Id.* at 82. Here, in contrast, the record is replete with references to the fact that the Huseins were hovering barely above the poverty line. The district court also spent considerable time discussing the evidence that Husein had presented regarding the essential nature of her financial responsibilities to the family. Although the government insisted at oral argument that Husein had "defrauded" the court by inconsistently representing the extent of her financial contributions and that nothing in the record "excludes [the existence of] other income," these arguments are unpersuasive. Not only were these arguments never raised before the district court, but the government's attorney

in fact conceded at the sentencing hearing that "in this instance I would personally agree that the situation comes somewhat close to what might be considered extraordinary circumstances."

If the stricter de novo standard of review were still applicable, we might be more inclined to conclude that Husein had failed to prove her irreplaceability. But under the again-prevailing abuse-of-discretion standard, we hesitate to "second guess" the determination of the district court. *See Menyweather*, 431 F.3d at 700. We instead defer to the district court, which possesses a "special competence" because of its "vantage point and day-to-day experience in criminal sentencing" to determine whether the facts are sufficiently extraordinary to warrant a departure. *See Koon*, 518 U.S. at 98, 99. Deference is especially appropriate where, as here, the court "clearly explains the basis for its finding of an extraordinary family circumstance." *Owens*, 145 F.3d at 929.

We acknowledge that *United States v. Reed*, 264 F.3d 640 (6th Cir. 2001), which has been declared the "leading case in the Sixth Circuit on the propriety of a downward departure for family responsibilities," *Marine*, 94 F. App'x at 310, was also decided under the abuse-of-discretion standard, albeit in its pre-PROTECT Act incarnation. The *Reed* court held that the district court had in fact abused its discretion in departing downward 13 levels to account in part for the money-laundering defendant's role in helping to care for her sister's five children. *Reed*, 264 F.3d at 655. A psychiatrist-prepared assessment had deemed Reed "the glue that holds this family together" for her role in supervising her "dysfunctional" sister and raising her sister's children. *Id.* at 653.

But *Reed*, too, is distinguishable from the present case because Reed, unlike Husein, was not living with or financially supporting the nieces and nephews there in question, and in fact took extended, sometimes several-months-long vacations to Jamaica every year. *Id.* at 655 (finding the district court's failure to address these facts "troubling"). Two cases from this circuit that have upheld significant, family-circumstances-based downward departures have distinguished *Reed* on similar grounds. *See Holz*, 118 F. App'x at 934 (approving a fully noncustodial sentence despite a Guidelines range of 12 to 18 months in prison by concluding that "[t]he district court's factual conclusions [regarding Holz's irreplaceability vis-à-vis his wife] in this case, on the contrary [to *Reed*], find meaningful support in the record"); *Marine*, 94 F. App'x at 311 (distinguishing *Reed* in approving a 10-level downward departure due to Marine's irreplaceability vis-à-vis her three minor children, resulting in a Guidelines range of 30 to 37 months in prison despite an initial range of 87 to 108 months).

We therefore conclude that the district court did not abuse its discretion by departing downward under § 5H1.6. As noted, however, we must still review the resulting one-day prison sentence for reasonableness within the meaning of *Booker* and 18 U.S.C. § 3553(a). *Cf. Menyweather*, 431 F.3d at 700-01 (holding that even if the district court abused its discretion in departing downward under § 5H1.6, that error was harmless because family responsibilities can also form part of the "broader appraisal" under § 3553(a) that is mandated by *Booker*).

### 2.        *Husein's sentence was both procedurally and substantively reasonable*

In the sentencing memorandum that she submitted to the district court, Husein argued that she was entitled to the noncustodial sentence that she ultimately received with or "even without a downward departure from the guidelines" under § 5H1.6. Post-*Booker* caselaw confirms Husein's understanding that family circumstances can form the basis of either a Guidelines-authorized departure or a non-Guidelines, § 3553(a)-based departure, also known as a variance. *Cf. United States v. Cousins*, 469 F.3d 572, 577 (6th Cir. 2006) (differentiating between a departure "based on Chapter 5 of the Guidelines" (a "Guidelines departure") and one "based on section 3553(a) factors" (a "non-Guidelines departure" or "variance")). This point was well stated by the Ninth Circuit in *Menyweather*:

In the broader appraisal[] available to district courts after *Booker*, courts can justify consideration of family responsibilities, an aspect of the defendant's history and characteristics, 18 U.S.C. § 3553(a)(1), for reasons extending beyond the Guidelines. District courts now have the discretion to weigh a multitude of mitigating and aggravating factors that existed at the time of mandatory Guidelines sentencing, but were deemed not ordinarily relevant, such as age, education and vocational skills, mental and emotional conditions, employment record, and *family ties and responsibilities*.

431 F.3d at 700 (emphasis in original) (ellipses, footnotes, and quotation marks omitted).

### a.          *Procedural reasonableness*

We review sentences post-*Booker* for reasonableness. *Webb*, 403 F.3d at 383. Under the law of this circuit, reasonableness has both procedural and substantive components. *United States v. Caver*, 470 F.3d 220, 248 (6th Cir. 2006). A sentence is procedurally unreasonable "if the district judge fails to 'consider' the applicable Guidelines range or neglects to 'consider' the other factors listed in 18 U.S.C. § 3553(a), and instead simply selects what the judge deems an appropriate sentence without such required consideration." *Id.*

In the present case, the district court explicitly mentioned § 3553(a) only once in the course of Husein's entire sentencing hearing. Even then the reference was only to the statute as a whole, as opposed to one or more of its seven individual subsections. In some sense, the lack of an explicit § 3553(a) analysis is understandable. The bulk of the sentencing hearing revolved around Husein's motion for a downward departure based on extraordinary family circumstances, which the district court treated almost exclusively as a motion for a Guidelines departure as discussed above. Nevertheless, *Booker* requires us to determine whether the overall sentence, of which the downward departure is only a part, is reasonable within the parameters set by § 3553(a). *Webb*, 403 F.3d at 383; *see also Selioutsky*, 409 F.3d at 119 (treating the question of whether a departure is permissible under the Guidelines as simply one element of the general reasonableness review mandated by *Booker*).

The district court need not discuss each and every § 3553(a) factor, but the reasons that it does provide for the sentence must sufficiently reflect considerations akin to those enumerated in the statute. These points were recently summarized in *United States v. Dexta*, 470 F.3d 612, 614-15 (6th Cir. 2006), as follows:

The court need not explicitly consider each of the § 3553(a) factors; a sentence is procedurally reasonable if the record demonstrates that the sentencing court addressed the relevant factors in reaching its conclusion. Moreover, satisfaction of the procedural reasonableness requirement does not depend on a district court's engaging in a rote listing or some other ritualistic incantation of the relevant § 3553(a) factors.

*Id.* (citations omitted). That the district court treated Husein's motion almost exclusively as one for a Guidelines departure, accordingly, does not necessarily render the resulting sentence procedurally unreasonable. The issue is not *how* the district court considered the relevant factors, but simply *whether* it considered them at all.

A review of the record in the present case compels the conclusion that Husein's one-day sentence was procedurally reasonable. In arriving at this sentence, the district court considered facts that correspond to five of the seven § 3553(a) factors. And the seventh § 3553(a) factor—"the need to provide restitution to any victims of the offense," 18 U.S.C. § 3553(a)(7)—was inapplicable to Husein's case because, as the PSR makes clear, "there is no identifiable victim."

Regarding the first factor, the district court amply considered the "nature and circumstances" of Husein's offense as well as her "history and characteristics." 18 U.S.C. § 3553(a)(1). At various points during the sentencing hearing, the court addressed the degree of Husein's participation in the ecstasy transactions, the nature of her relationship with the relevant buyers and sellers, and the amount of ecstasy involved. The district court also considered Husein's background, including her financial and employment record, her lack of a criminal record, and, obviously, her family circumstances.

Despite the government's argument to the contrary, the district court also considered the second § 3553(a) factor, which directs the sentencing court to consider, among other things, "the seriousness of the offense" and the need "to afford adequate deterrence to criminal conduct," including "further crimes of the defendant." 18 U.S.C. § 3553(a)(2). The court explicitly determined that the sentence of 3 years' supervised release, which included an initial 270-day term of home confinement, would act as a sufficient deterrent to Husein despite the seriousness of her crime: "[Y]our family is going to benefit more by your presence than society is going to benefit from your incarceration. But the sentence in no way is meant to minimize what you did and your participation in this crime, and we hope that this is an adequate enough deterrent to you so that you don't engage in criminal activity in the future." *See also Menyweather*, 431 F.3d at 701 (emphasizing, in upholding as reasonable a family-circumstances-based downward departure, that "[t]he district court clearly believed that, in this case, the potential harm to the close relationship between this single parent and her child outweighed the benefits of a prolonged period of incarceration to achieve deterrence, protection of the public, and punishment").

Regarding the third, fourth, and fifth factors, the district court considered the availability of both custodial and noncustodial sentencing options, the applicable Guidelines range of 37 to 46 months in prison, and also, as noted above, the Sentencing Commission's stated policy of discouraging the invocation of family circumstances as a ground for a downward departure. *See* 18 U.S.C. § 3553(a)(3),(4) & (5).

The only applicable factor that the district court appears not to have considered is the sixth factor, which references "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). To be sure, as this court recently emphasized in *United States v. Davis*, 458 F.3d 491, 499 (6th Cir. 2006), drastic departures from the applicable Guidelines range typically "leav[e] no room to make reasoned distinctions" between the fortunate defendant and others who might be more deserving. But, as discussed in the substantive-reasonableness analysis below, affirming Husein's sentence in the present case would not be contrary to the goal of allowing for "reasoned distinctions" that § 3553(a)(6) codifies. We thus conclude that the sentence imposed by the district court, which considered at least five of the six relevant § 3553(a) factors, was procedurally reasonable. *See Dexta*, 470 F.3d at 615 (finding a sentence to be procedurally reasonably despite the fact that "[u]ndeniably, the district court did not explicitly consider each and every § 3553(a) factor").

### b.     *Substantive reasonableness*

"[E]ven if a sentence is calculated properly, i.e. the Guidelines were properly applied and the district court clearly considered the § 3553(a) factors and explained its reasoning, a sentence can yet be unreasonable." *United States v. Cage*, 451 F.3d 585, 591 (10th Cir. 2006), *quoted in Davis*, 458 F.3d at 496. A sentence is substantively unreasonable if the district court "selects the sentence arbitrarily, bases the sentence on impermissible factors, fails to consider pertinent § 3553(a) factors or gives an unreasonable amount of weight to any pertinent factor." *Caver*, 470 F.3d at 248 (brackets and quotation marks omitted).

Although within-Guidelines sentences receive a presumption of reasonableness in this circuit, *United States v. Williams*, 436 F.3d 706, 708 (6th Cir. 2006), "a sentence outside of the Guidelines range—either higher or lower—is [not] presumptively *un*reasonable. It is not. Rather, our reasonableness review is in light of the § 3553(a) factors which the district court felt justified such a variance." *United States v. Collington*, 461 F.3d 805, 808 (6th Cir. 2006) (emphasis in original) (citation and quotation marks omitted). In reviewing outside-the-Guidelines sentences such as the one imposed in the present case, accordingly, "we apply a form of proportionality review: the farther the judge's sentence departs from the guidelines sentence[,] the more compelling the justification based on factors in section 3553(a) must be." *Davis*, 458 F.3d at 496 (quotation marks omitted).

To be sure, *Davis*'s emphasis on the distinction between a § 3553(a), multifactor variance (at issue there) and a Guidelines-authorized departure (at issue here) leaves open the question of whether the proportionality test applies to both. *See Davis*, 453 F.3d at 497 (noting that the district court granted Davis a variance despite having denied him a downward departure). We will simply assume without deciding that the answer is "yes" because, as set forth below, we believe that the downward departure granted to Husein in the present case passes muster even under *Davis*.

As an initial matter, the offense to which Husein pled guilty, 21 U.S.C. § 841(b)(1)(C), does not mandate a minimum sentence. (The statutory range is 0 to 20 years in prison.) Congress thus not only envisioned, but accepted, the possibility that some defendants found guilty of that subsection of the statute would receive no jail time at all. This is especially significant in the area of drug-related crimes, where mandatory-minimum sentences, including those mandated by 21 U.S.C. §§ 841(b)(1)(A) and (b)(1)(B), are most common. Section 841(b)(1)(C)'s lack of a mandatory-minimum sentence, in other words, reflects Congress's stated intent to reserve such sentences for "significant drug traffickers." Janet Reno & Barry R. McCaffrey, *Letter to President Clinton: Crack and Powder Cocaine Sentencing Policy in the Federal Criminal Justice System*, 10 Fed. Sent. R. 192 (1998) (discussing the legislative history of the federal Anti-Drug Abuse Act of 1986).

As both this court and the Supreme Court have recognized, moreover, the existence of a mandatory minimum directly affects the discretion of a sentencing judge. *See United States v. Fernandez*, No. 99-5886, 2000 WL 875695, at *1 (6th Cir. June 19, 2000) ("When a statutory minimum sentence is involved, . . . the district court lacks discretion to depart downward on the basis of family circumstances."); *Harris v. United States*, 536 U.S. 545, 570 (2002) (Breyer, J., concurring) ("[S]tatutory mandatory minimums generally deny the judge the legal power to depart downward, no matter how unusual the special circumstances that call for leniency."). Accordingly, if a mandatory minimum denies discretionary authority to a sentencing judge, then that authority is *a fortiori* restored where, as here, no mandatory minimum exists.

Sentences must nonetheless comport with prevailing standards of reasonableness, of course, and we recognize that Husein's one-day sentence in the present case represents an exponentially large departure from the applicable advisory Guidelines range of 37 to 46 months in prison. Expressed as a percentage, the departure is 99.91% below the low end of the range. This makes it even more extraordinary than the 99.89% variance (from a 30-to-37-month range to a one-day sentence) held to be unreasonably and unjustifiably low under the "proportionality" standard of review first articulated and employed by this court in *Davis*. But in judging the extent of the departure granted by the district court in this case, we bear in mind the departure's primary purpose of allowing Husein to provide the assistance that her father needed to survive. *Any* time that Husein would have spent in jail necessarily would have defeated this purpose. *Cf.* U.S.S.G. § 5H1.6, cmt. 1(B)(iv) (listing as a consideration for family-circumstances-based downward departures whether "[t]he departure effectively will address the loss of caretaking or financial support"). This

distinguishes the present case from *Davis*, which instead dealt with a multifactor-based variance whose only discernible purpose was, and generally is, leniency.

In *Davis*, the court's principal concern with the one-day sentence imposed by the district court was that it represented "the most extreme variance possible, leaving no room to make reasoned distinctions between Davis's variance and the variances that other, more worthy defendants may deserve." 458 F.3d at 499; *see also* 18 U.S.C. § 3553(a)(6) (listing as a consideration "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct"). To be sure, Husein's one-day sentence in the present case also represents "the most extreme [departure] possible." But unlike in *Davis*, it leaves fairly ample "room to make reasoned distinctions" between Husein's Guidelines departure and what other defendants with extraordinary family circumstances might receive. These distinctions will be based not only on the exigency or seriousness of the family circumstances in each individual case, but also on the relative "worthiness" of each individual defendant. No judge, for example, would likely reduce the sentence of a convicted mass murderer due to family circumstances, and we do not intend to suggest otherwise. The extent of a downward departure or variance, in other words, should bear an inversely proportional relationship to the "evilness" of the crime, and criminal, at issue.

In *Davis*, the court belabored the defendant's considerable *un*worthiness: "The record shows that the fraud [perpetrated by Davis] caused over $900,000 in loss; Davis did not repay the lost money; he did not accept responsibility for the crimes; and he has yet to show remorse for the crimes." 458 F.3d at 498. If such a defendant received what amounted to the lowest sentence possible, the court worried, how could sentencing courts confronted with far more worthy defendants possibly grant greater, more deserved departures? And would those courts necessarily also have to award the bare minimum sentence that Davis had received? The court foresaw numerous scenarios in which this problem might arise:

> Consider the possibilities for other defendants in this area: those who paid restitution; those who accepted responsibility for the crime and showed remorse for committing it; those who used the time between the commission of the crime and sentencing to engage in other acts demonstrating rehabilitation; and, with respect to elderly defendants, those who had become infirm in the intervening years.

*Davis*, 458 F.3d at 499.

In the present case, however, "more worthy defendants" than Husein are difficult to imagine, short of those found to be not guilty. Her actions—namely, helping to arrange the sale of ecstasy between several of her acquaintances—caused no immediate harm to the individuals involved, much less the type of harm for which restitution was available as in *Davis*. In addition, Husein fully accepted responsibility for her actions, a fact that the district court credited by adopting the portion of the PSR that had reduced Husein's base offense level by three levels. This three-level adjustment was also based on Husein's having "provided timely information to the government concerning her involvement in the offense."

She further appears to have expressed remorse for her actions, as several handwritten letters from family members and coworkers attest. Husein was also found to have no prior criminal history, thereby placing her in Category I for the purpose of calculating her advisory Guidelines range. *See Davis*, 458 F.3d at 495-96 ("[O]ne of the principal functions of § 3553(a) . . . [is] eliminating sentencing 'disparities among defendants with *similar records* who have been found guilty of similar conduct.'" (quoting 18 U.S.C. § 3553(a)(6))) (emphasis added).

In light of these various factors and assuming an equally extraordinary set of family circumstances, few if any other defendants could be deemed more "worthy" than Husein of "the

most extreme [departure] possible" without also being not guilty of the crimes charged. *See Davis*, 458 F.3d at 499. But in the world of *convicted and guilty* defendants, which is obviously the only pool of defendants to which *Davis* applies, Husein appears to be precisely the type of defendant most worthy of the one-day sentence that she received. Affirming her sentence therefore would not, as the court feared in *Davis*, "leav[e] no room to make reasoned distinctions" for other similarly situated defendants. *Id.* To the contrary, the drawing of such distinctions would be facilitated by establishing a concrete example of the circumstances that render a defendant eligible for the lowest end of the statutory range.

We also note that the substantive reasonableness of Husein's sentence is supported by two of this court's recent decisions. *See United States v. Fuson*, No. 05-3782, 2007 WL 414265, at *6 (6th Cir. Feb. 8, 2007) (holding, in a case involving a felon's possession of an antique handgun, that a one-day sentence despite the 27-to-33 month applicable Guidelines range was both procedurally and substantively reasonable under *Davis*, especially in light of the "particularly unique" nature and circumstances of the offense); *United States v. Collington*, 461 F.3d 805, 807 (6th Cir. 2006) (approving a sentence resulting from a 36% variance below the low end of the applicable Guidelines range on account of the defendant's "personal history, his criminal history, and his age").

Even the present author's dissent in *Collington* is consistent with the result here because, in the eyes of the dissent, Collington's "primary redeeming attribute," and the main justification for the variance he received, was simply the "speculative possibility that he might be amenable to rehabilitation." 461 F.3d at 816 (Gilman, J., dissenting). The justification for the downward departure granted to the far more deserving Husein, in contrast, was not only more circumscribed, but, as her father's death only four months after sentencing attests, all too real. We particularly note that Husein was assessed zero criminal-history points (Criminal History Category I), whereas Collington (Category IV) and even Fuson (Category II) had more significant criminal backgrounds. For all of the reasons set forth above, we conclude that Husein's sentence is substantively reasonable under the proportionality test of *Davis*.

## C.        The effect of the post-sentencing discoveries and developments

Before determining the effect of the government's post-sentencing evidence on the district court's judgment, we must first determine whether we even have the authority to consider the evidence for the first time on appeal. The government has not addressed this threshold matter in any significant detail in its briefs, so whether the issue is properly before us on appeal is questionable. *See United States v. Johnson*, 440 F.3d 832, 845-46 (6th Cir. 2006) ("[I]t is a settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."). We will give the government the benefit of the doubt, however, and hold that the issue is ripe for disposition because the degree of development is a close question on which reasonable jurists could differ.

### 1.        *Driver's licenses of Husein's mother and sister*

In a footnote in its initial brief, the government argues that, pursuant to a search conducted on "westlaw.com" after sentencing, it discovered that both Husein's mother and sister possessed valid driver's licenses. Because Husein had represented, and the district court had accepted at sentencing, that she was "the only member of the household with a valid driver's license," the government maintains that the court's irreplaceability determination was based in large part on misinformation. The government thus seeks to introduce that evidence now, purportedly to ensure "a sentencing based on complete and accurate information." In effect, the government is asking us, as an appellate court, to take judicial notice of a post-judgment fact.

The government is fighting a decidedly uphill battle. This court has long maintained that "[a] party may not by-pass the fact-finding process of the lower court and introduce new facts in its

brief on appeal." *Sovereign News Co. v. United States*, 690 F.2d 569, 571 (6th Cir. 1982). A similar policy is codified in Rule 10(a) of the Federal Rules of Appellate Procedure, which limits the record on appeal to "the original papers and exhibits filed in the district court," "the transcript of proceedings, if any," and "a certified copy of the docket entries prepared by the district clerk." Fed. R. App. P. 10(a). To be sure, "if anything material to either party is omitted from or misstated in the record by error or accident," Rule 10(e)(2) allows "the omission or misstatement [to] be corrected and a supplemental record [to] be certified and forwarded." Fed. R. App. P. 10(e)(2). Among the individuals or entities specifically authorized to thus correct and supplement the record, moreover, is "the court of appeals." Fed. R. App. P. 10(e)(2)(C). But this court has cautioned that "as is clear from the rule's wording, the purpose of the rule is to allow the court to correct omissions from or misstatements in the record for appeal, *not to introduce new evidence in the court of appeals*." *Inland Bulk Transfer Co. v. Cummins Engine Co.*, 332 F.3d 1007, 1012 (6th Cir. 2003) (emphasis added).

Absent an opportunity to review the relevant records (which the government has failed to furnish to this court), and in light of Husein's vigorous challenge to both their accuracy and relevance, we are unable to conclude that the disputed statement currently in the record is actually a "misstatement" of fact. (Certainly we cannot say that, even if it were a misstatement, it was the result of "error" or "accident." Fed. R. App. P. 10(e)(2).) We reiterate that alternative sources of care would weaken Husein's claim of irreplaceability only if they were "reasonable" or "feasible" alternatives. *See* Part II.B.1. above. That Husein's almost 18-year-old sister Shadya might have possessed a limited driver's license at the time of sentencing and a full license shortly thereafter by no means establishes that Shadya, who was a full-time high-school student at the time, could feasibly have cared for her father and the rest of the family in a manner comparable to that of Husein herself. Similarly, even assuming that the government's unverified and undated discovery that Husein's mother Fizan had a driver's license were applicable to the time of sentencing, that assumption alone does not clearly establish that Husein's mother in fact drove or was capable of driving during that period.

In any event, the government's failure to ascertain Shadya's and Fizan's legal driving status *before* sentencing—despite the absence of any barrier to doing so— demonstrates, at best, a lack of diligence. The government complains that the Probation Officer's letter concerning his September 15, 2005 visit to the Husein residence was not transmitted to the parties until the start of the sentencing hearing on October 5, 2005. As a result, it claims that "the government had no advance notice of, and no opportunity to challenge, the many unconfirmed allegations in that letter, which recites [in part] that: 'The defendant reported that she i[s] the only person in the home with a driver's license.'" But this argument ignores the fact that Husein's sentencing memorandum, filed nearly one month before the sentencing hearing, contained the following allegation that is nearly identical: "In addition, the defendant is the only healthy member of the household with a valid drivers [sic] license . . . ." Accordingly, we hold that Rule 10(e) does not justify supplementation of the record in the present appeal.

Some courts have also held that the record may be supplemented pursuant to the appellate court's "equitable authority." *Cummings Engine*, 332 F.3d at 1012-13 (collecting cases as well as supportive secondary authorities). The Sixth Circuit has of yet not so held. *Id.* at 1012. But this court has indicated that if it were to assume the existence of such an "equitable authority," the dispositive issue would be whether the evidence sought to be added to the record in a given appeal "establishes beyond doubt the proper disposition of [the pending issues]." *Id.* at 1013. Under this test, supplementation of the record in the present case is unwarranted. Although the fact that Husein's mother and sister might have possessed driver's licenses at the time of sentencing undermines the district court's determination that Husein was irreplaceable, it hardly "establishes beyond doubt" that this determination constituted an abuse of discretion. We would need to be presented with additional information to be able to draw such a conclusion—namely, whether the

mother was in fact capable of driving and whether the sister feasibly could have attended school and driven around town to run errands for the family at the same time.

The government's request could also be interpreted as an attempt to have us formally take judicial notice of the post-sentencing facts in question. Rule 201 of the Federal Rules of Evidence governs when and how courts can take judicial notice. *See* Fed. R. Evid. 201 ("Judicial Notice of Adjudicative Facts."). The government's evidence, however, meets few, if any, of the requirements that the rule prescribes.

To start with, Rule 201(b) requires that a fact sought to be judicially noticed not be "subject to reasonable dispute." Fed. R. Evid. 201(b) ("A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to *sources whose accuracy cannot reasonably be questioned*.") (emphasis added). Even if we were to assume that the parties do not dispute the existence of the relevant driver's license records on "westlaw.com"—by no means a safe assumption—certainly "there is considerable dispute over the significance of [their] contents." *See United States v. Bonds*, 12 F.3d 540, 553 (6th Cir. 1993) (affirming the district court's refusal to take judicial notice of a certain report despite the absence of a dispute over whether the report existed in the first place (citing Fed. R. Evid. 201(b))).

In the present case, Husein opposes the government's argument as "inaccurate and unfair because as of the date of defendant's sentencing, the defendant's mother did not have a valid drivers [sic] license, and the defendant's sister was certainly not available to take over driving responsibilities for this family." Judicial notice is typically a discretionary function. Because both the existence and the significance of the driver's licenses are in dispute, we exercise our discretion to deny the government's request due to noncompliance with the threshold requirements of Rule 201(b).

To be sure, judicial notice is mandatory under certain circumstances. "A court *shall* take judicial notice if requested by a party *and supplied with the necessary information*." Fed. R. Evid. 201(d) (emphasis added). The government in the present case, however, has offered us nothing but a vague reference to "westlaw.com." Although the relevant information might well be available in one of Westlaw's many online databases, that fact alone, without any guidance from the government as to *where* in Westlaw one might locate the information, hardly fulfills the mandate of Rule 201(d).

We also note that the effect of judicial notice is different in the civil context than in the criminal context. A judicially noticed fact is conclusive in a civil case, and the court must instruct the jury to treat it as such. Fed. R. Evid. 201(g). But in a criminal case the judicial imprimatur is less definitive: "[T]he court shall instruct the jury that it *may, but is not required to*, accept as conclusive any fact judicially noticed." *Id.* (emphasis added). Were we to judicially notice the post-sentencing facts at issue here, accordingly, we would in effect be treating as conclusive at the appellate level what by law would not have been treated as conclusive at the trial level.

For all of these reasons, we decline to judicially notice or otherwise add to the record the post-sentencing evidence presented by the government regarding Husein's mother and sister. We add that the government could have pursued another avenue. This court has suggested in the civil context that where, as here, Rule 10(a) of the Federal Rules of Appellate Procedure precludes the court from considering evidence for the first instance on appeal, the proper "recourse is to move the district court for relief from its judgment pursuant to Fed. R. Civ. P. 60(b)." *Johnson v. Hanes Hosiery*, No. 94-6184, 1995 WL 329453, at *2 (6th Cir. June 1, 1995). The government in the present case accordingly could have pursued the criminal equivalent of a Rule 60(b) motion for relief in the district court. *See* Fed. R. Crim. P. 35 ("Correcting or Reducing a Sentence."); *cf. United States v. Sanzo*, 831 F.2d 671, 672 (6th Cir. 1987) (concluding, where the defendant filed a

Rule 35(b) motion to reduce his sentence after filing a notice of appeal, that "the defendant must submit certification by the district court that it is inclined to grant the Rule 35(b) motion before a remand is warranted").

### 2.          *Death of Husein's father*

Finally, the government argues that because of the death of Husein's father four months after sentencing, Husein is currently enjoying a "windfall" by remaining at home as opposed to being in prison. We dismiss this argument for reasons related to those relied on by Justice Scalia in his response to a similar argument in *Jones v. Thomas*, 491 U.S. 376 (1989):

> Does this produce, as the [government] alleges . . . an unjustified windfall? Undoubtedly. . . . [J]ust as the Double Jeopardy Clause often does (to an even greater degree) in other contexts—where, for example, a prosecutorial error after the jury has been impaneled permits the defendant to go off scot free.

*Id.* at 389-90 (Scalia, J., dissenting) (citing *Downum v. United States*, 372 U.S. 734, 737-38 (1963)) (brackets, citations, and quotation marks omitted).

The finality of judgments is a key element of the American system of justice. *Teague v. Lane*, 489 U.S. 288, 309 (1989) ("Application of constitutional rules not in existence at the time a conviction became final seriously undermines the principle of finality which is essential to the operation of our criminal justice system."). This is especially true for defendants in criminal cases, where the enhancement of a sentence in a subsequent proceeding can violate the defendant's rights to the due process of law. As the Supreme Court has held, "when the Government has already imposed a criminal penalty and seeks to impose additional punishment in a second proceeding, the Double Jeopardy Clause protects against the possibility that the Government is seeking the second punishment because it is dissatisfied with the sanction obtained in the first proceeding." *United States v. Halper*, 490 U.S. 435, 451 n.10 (1989), *abrogated on other grounds by United States v. Ursery*, 518 U.S. 267 (1996).

The relevant question is "whether the addition[al sentence] upsets the defendant's legitimate 'expectation of finality in the original sentence.'" *Jones*, 491 U.S. at 394 (Scalia, J., dissenting) (quoting *United States v. DiFrancesco*, 449 U.S. 117, 139 (1980)). "If a defendant has a legitimate expectation of finality, then an increase in that sentence is prohibited . . . ." *United States v. Fogel*, 829 F.2d 77, 87 (D.C. Cir. 1987). "A defendant has a legitimate expectation in the finality of a sentence *unless he is or should be aware at sentencing that the sentence may permissibly be increased.*" *Id.* (emphasis added).

In the present case, nothing in the record indicates that Husein was aware at the time of sentencing that her sentence could "permissibly be increased" or otherwise transformed from noncustodial to imprisonment. The district court, to be sure, did warn Husein that "if you do anything that is violative of the conditions [of home confinement and supervised release] that are set on you, you could find yourself back here or in front of some other Court and another Judge may not give you this break that you are asking for and that we granted today." But the court did not mention that a change in Husein's family circumstances, the relevant issue here, also might result in an increased sentence.

Nor should Husein have been so aware, except perhaps with respect to the ever-present but here-inapplicable possibility of a post-sentencing amendment designed to remedy a clerical error in the judgment. *See United States v. Whittington*, 918 F.2d 149, 151 (11th Cir. 1990) ("Because the record is merely being corrected and not relitigated, finality concerns are not applicable." (citing Fed. R. Crim. P. 36)). This is not a case, for example, where the defendant is "charged with knowledge that the court lacked statutory authority to impose [a] subminimum sentence in the first

place." *See Jones*, 491 U.S. at 394-95 (Scalia, J., dissenting) (discussing Bozza *v. United States*, 330 U.S. 160, 166-67 (1947)). As discussed in Part II.B.2.b. above, Husein's statutory charges carried no mandatory minimum sentences. *See* 21 U.S.C. § 841(b)(1)(C).

The government further argues that "[a]s events unfolded, a mere four-month delay in the defendant's sentencing or her report date would have obviated the need for any departure whatsoever." In its reply brief, the government clarifies its position as follows:

> Clearly, the district court could not have known that the defendant's father would die only four months later, and we do not suggest as much. However, given the fact that the defendant's father suffered from multiple and worsening ailments and a "drastically reduced life expectancy," we do submit that the district court could, and should, have at least *considered* the possibility of either delaying sentencing or granting a delayed report date as part of the sentencing equation.

(Emphasis in original.)

But the fact remains that the district court did not do so, and that the government, more tellingly, never asked the court to do so. The government cites no authority for the proposition that a district court should sua sponte consider such possibilities in analogous circumstances. If the government had even the faintest visions of appealing Husein's sentence on this ground—a likely possibility in light of the government also having been well aware of Husein's father's "drastically reduced life expectancy"—at the very least it should have made that view known to the district court and thus part of the record.

Finally, although the health of Husein's father was the primary family circumstance on which the district court based its downward departure, it was not the only circumstance. The court also took note of Husein's "significant" responsibilities to her siblings and mother. Accordingly, the likelihood that waiting for Husein's father to die would have resulted in the district court's imposing an entirely different sentence is not as certain as the government seems to imply. Several of the extraordinary circumstances would still have existed, and Husein presumably would have had the added responsibility of helping her mother and siblings cope with the loss of their husband and father.

For all of these reasons, the government's windfall argument is without merit. It is also shortsighted. What if, instead of "getting better," Husein's family situation had actually become worse? Suppose, for example, that both Husein's father *and* mother had died in the several months after sentencing, leaving Husein alone to care for her three younger siblings. Also suppose that Husein had timely appealed on other grounds and, upon learning of this unfortunate news, argued for the first time that even her term of home confinement and supervised release was too harsh of a punishment. Would this court have accepted her argument and further reduced her sentence? Almost certainly not.

We see no reason why we should respond to the government's argument in the present appeal any differently. To hold to the contrary, after all, would mainly harm the government by subjecting it to a flood of post-sentencing litigation brought by unforeseeably worse-off defendants. As the saying goes, "what is sauce for the goose is sauce for the gander." *See, e.g.*, *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 134 (2001) (Souter, J., dissenting).

The essence of the problem in this case is the government's failure to ask the district court to fashion a sentence that would take into account the likelihood that Husein's father would die in the immediate future. Its afterthought on appeal simply comes too late.

We pause briefly to comment on the status of this case in light of the Supreme Court's pending decision in *United States v. Claiborne*, 439 F.3d 479 (8th Cir.), *cert. granted*, 127 S. Ct. 551 (2006), which will address, among other things, whether proportionality review of outside-the-Guidelines sentences is constitutional in light of *Booker*. Although this and numerous other courts have found that holding certain cases in abeyance pending *Claiborne*'s resolution is appropriate, this is not one of those cases. Because we conclude that Husein's sentence survives the comparatively more stringent proportionality review mandated by *Davis*, we would necessarily affirm even if *Claiborne* were to hold that form of review unconstitutional as an additional standard improperly grafted onto basic *Booker*-reasonableness review.

We also recognize that, as in *Fuson*, this case "approach[es] the boundary of the district court's broader sentencing discretion under *Booker*." 2007 WL 414265, at *6. But the plain import of *Booker* is that a 1-day, below-the-Guidelines sentence, no less than a 7,300-day, above-the-Guidelines sentence, is now a viable sentence for a district court to impose so long as it is authorized by statute and reasonable within the meaning of 18 U.S.C. § 3553(a). *Cf. United States v. Booker*, 543 U.S. 220, 264 (2005) ("[T]he [Sentencing Reform] Act without its mandatory provision . . . remains consistent with Congress' initial and basic sentencing intent[:] to provide certainty and fairness . . . avoid[] unwarranted sentencing disparities . . . and [yet] maintain[] sufficient flexibility to permit individualized sentences where warranted.") (quotation marks omitted). Because Husein's sentence both falls within the statutory range and survives reasonableness review as defined by the law of this circuit in *Davis*, we find no abuse of the district court's *Booker* discretion under the unique facts of this case.

### III.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.